**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| MARK CHASE, derivatively on behalf of Nominal Defendant KRISPY KREME, INC.,<br><br>Plaintiff,<br><br>v.<br><br>JOSHUA CHARLESWORTH, JEREMIAH ASHUKIAN, MARISSA ANDRADA, DAVID BELL, PATRICIA CAPEL, DAVID DENO, OLIVIER GOUDET, PAUL S. MICHAELS, GERHARD PLEUHS, DEBBIE ROBERTS, PHILIP TELFER, and MICHELLE WEESE,<br><br>Defendants,<br><br>and<br><br>KRISPY KREME, INC.,<br><br>Nominal Defendant. | CASE NO.<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Mark Chase ("Plaintiff"), by and through his attorneys, hereby submits this Shareholder Derivative Complaint (the "Complaint") for the benefit of Nominal Defendant Krispy Kreme, Inc. ("Krispy Kreme" or the "Company") against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy Defendants' breaches of fiduciary duties and unjust enrichment from March 26, 2024 and May 7, 2025 (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which included, among other things, review and analysis of: a) public filings made by Krispy Kreme and other related parties and non-parties with the Securities and

Exchange Commission ("SEC"); b) press releases and other publications disseminated by certain of the Defendants and other non-parties; c) news articles, shareholder communications and postings on Krispy Kreme website; d) publicly available filings in a related securities class action lawsuit captioned *In re Krispy Kreme Securities Litigation*, Case No. 3:25-cv-00332 in the U.S. District Court for the Western District of North Carolina (the "Securities Action"); and e) other publicly available information concerning Krispy Kreme and the Individual Defendants (defined below under "Parties.") Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. Krispy Kreme is a doughnut brand that originally became a public company in 2000, but was taken private by JAB Holdings in 2016. JAB Holdings re-listed Krispy Kreme on public markets again in 2021. After going public for the second time in 2021, Krispy Kreme stated that "by far and away the #1 reason customers [did] not purchase" the Company's doughnuts was "lack of access."

2. On October 18, 2022, McDonald's and Krispy Kreme announced a "small operations test" in which Krispy Kreme doughnuts would be "delivered fresh daily" to nine McDonald's locations in the Louisville, Kentucky area. The small test was quickly expanded.

3. Less than five months later, on February 27, 2023, the companies announced that the test program would grow to 160 McDonald's locations around the Louisville-Lexington, Kentucky area. According to the press release announcing the expansion, the "expanded test" aimed to evaluate the "operational impact" of delivering fresh doughnuts on "a larger scale" and to "explore customer demand" for Krispy Kreme doughnuts at McDonald's locations.

4. As the Individual Defendants (defined herein) made clear in investor presentations, the ability to have "More Points of Access," which was exactly what McDonald's provided, would lead to "Higher Sales per Hub," which, in turn, meant "Higher EBITDA Margin." Thus, the "unique unlock" of the expanded test was ensuring that the DFD system worked seamlessly to bring fresh doughnuts across all customers on the route—including McDonald's—which the Individual Defendants assured "it does."

5. Given the importance of a potential nationwide deal with McDonald's, the Individual Defendants repeatedly assured investors that they were closely monitoring the expanded McDonald's test for both operational performance and customer demand. Relatedly, the Individual Defendants represented that the McDonald's rollout would only proceed if the Company was able to handle the logistics profitably, and that they had carefully analyzed the costs and logistics necessitated by such a major deal. For example, during a Morgan Stanley Global Consumer & Retail Conference held on December 5, 2023, Defendant Joshua Charlesworth ("Charlesworth") emphasized that Krispy Kreme had conducted "a lot of detailed work" on the potential McDonald's expansion and concluded that the associated expenses would remain modest. In fact, Charlesworth stated that the Company could service "just under half" of McDonald's locations—approximately 6,000 new doors—using its "existing capacity" and requiring little more than "just [] trucks and drivers."

6. On March 26, 2024, the Individual Defendants announced a nationwide expansion of its McDonald's partnership that was expected to "more than double" DFD access points in the U.S. This expansion followed the "successful test at 160 McDonald's restaurants" in Kentucky "where consumer excitement and demand exceeded expectations." Significantly, Krispy Kreme also confirmed to investors that it was ready to begin the nationwide McDonald's expansion

precisely because the Company had the infrastructure and logistics capabilities necessary for the rollout to succeed. Indeed, the Individual Defendants expressly stated that in furtherance of the expansion, the Company had been busy "scaling its supply chain, building a support team, adding technology and new equipment, and enhancing field training to support its Delivered Fresh Daily expansion."

7. The Individual Defendants assured the market that "consumer response has been positive" as well. Indeed, in response to analysts' questions about McDonald's demand, the Individual Defendants stated that McDonald's customers were "clearly excited to see our fresh doughnuts on the menu," and that demand was completely "in line with our original assumptions." This was not guesswork. The Individual Defendants explained that they were closely monitoring how the doughnut sales were performing, explaining to investors that at McDonald's "we can track the deliveries. We can track any that are unsold. And, indeed, we can see that they clearly sold throughout the day." Moreover, the Individual Defendants represented that McDonald's was also happy with the performance because "everything we see" gave Krispy Kreme "confidence that this [strategy] resonates with the consumer and the feedback from McDonald's definitely shows that."

8. On February 25, 2025, mere after praising the "success" of the rollout, the truth about the Company's partnership with McDonald's began to emerge. On that date, Krispy Kreme announced poor fourth quarter 2024 results and issued full-year 2025 guidance that fell far short of expectations. Specifically, for fourth quarter 2024, the Company reported net revenue of $404 million—missing analysts' $415 million estimate—and $45.9 million in adjusted EBITDA, far below analysts' consensus of $58.7 million. In addition, while analysts had been projecting 2025 revenues between $1.76 billion and $1.94 billion, Krispy Kreme now forecasted just $1.55 billion

to $1.65 billion—a reduction of approximately 12% to 15%. Further, while adjusted EBITDA estimates had been $235 million to $259 million, Krispy Kreme's guidance was only $180 million to $200 million, a 15% to 31% shortfall amid increased costs. Projected earnings per share fared even worse, as the Company now expected $0.04 to $0.08 in EPS—72% to 86% below analysts estimates.

9. Significantly, during the earnings call held the same day, Defendant Jeremiah Ashukian ("Ashukian") acknowledged that the Company had in fact experienced issues with the McDonald's expansion. Specifically, the Individual Defendants acknowledged that Krispy Kreme had "seen consumer softness" specifically in McDonald's where "demand has dipped actually a little lower than we expected." Moreover, the Company also expected "margin compression" due to the need to make "long-term business investments" to fund the national rollout. Thus, contrary to the Individual Defendants' prior statements that the Company would be able to leverage existing capacity with limited investment, the "start-up costs from [the] US expansion" were now higher than the Company had previously let on. Moreover, despite previously claiming that Krispy Kreme could rely on its "existing capacity," with the Company only needing to make modest investments in items like "trucks and drivers," the Company would now engage a third-party company to execute "more than half of our DFD deliveries by year-end," which Charlesworth explained would provide "predictability in costs" and a "more streamlined set of operations.

10. In response to the news, Krispy Kreme stock decreased 35% over the following two days from a close of $9.13 on February 24, 2025 to just $5.97 on February 26, 2025.

11. On May 8, 2025, the full truth emerged. In stark contrast to the Individual Defendants' repeated assurances just two months earlier that the McDonald's rollout remained entirely "on track," the Individual Defendants admitted the Company had effectively abandoned

the McDonald's expansion by no later than February 2025. Specifically, after representing to the market on February 25, 2025 that Krispy Kreme had "today" expanded into 2,500 McDonald's locations, the Company now revealed that Krispy Kreme had not added a single new McDonald's location since February 25, 2025, and that the number of its McDonald's locations had actually decreased, as it was servicing only 2,400 McDonald's as of the May 8, 2025 call. Moreover, the Company disclosed that it did "not expect to launch in any additional restaurants in the second quarter of 2025," and that the McDonald's expansion was ceased precisely because Krispy Kreme had not "achieve[d] a profitable business model" with the McDonald's partnership.

12. As a result of these severe problems with the McDonald's partnership, Krispy Kreme issued disastrous financial results, reporting just $15.9 million of adjusted EBITDA for its U.S. segment— a 62% decline as compared to the first quarter of 2024—which it primarily blamed on "costs associated with our U.S. nationwide expansion." In addition, the Company pulled its 2025 outlook completely without providing alternative guidance, and in a desperate attempt to save cash, the Individual Defendants announced that Krispy Kreme would scrap its $0.35 quarterly dividend that the Company had been consistently paying since 2021.

13. The market reacted sharply to this news. After closing at $4.33 per share on May 7, 2025, Krispy Kreme's shares plunged 37% over the following two days to close at just $2.73 per share on May 9, 2025.

14. As a result of this alleged misconduct, Plaintiff served a pre-suit litigation demand on the Krispy Kreme Board of Directors ("Board") on April 22, 2026 ("Demand"). In accordance with Delaware law, the Demand required the Board to commence an investigation into the allegations detailed herein. A true and correct copy of the Demand is attached hereto as Exhibit A.

15. On April 28, 2026, Plaintiff's counsel received correspondence from Krispy Kreme's Chief Legal Officer Atiba Adams ("Mr. Adams"), who acknowledged the Board's receipt of the Demand and requested proof of Plaintiff's current ownership of Krispy Kreme stock. Plaintiff provided this evidence on May 7, 2026.

16. On July 6, 2026, Mr. Adams again wrote to Plaintiff's counsel, detailing the Board's decision to defer consideration of the Demand (the "Deferral"). In support of that decision, Mr. Adams specifically highlighted the Securities Action, noting that (1) the Demand and the Securities Action shared allegations; (2) that "the pursuit of the claims in the demand may adversely impact the Company's ability to effectively defend that action;" and (3) "…it would be inefficient and costly to pursue the demanded claims at this time and could interfere with the defense of the securities class action." A true and correct copy of the Deferral is attached hereto as Exhibit B.

17. On August 26, 2026, the Honorable Max O. Coburn, Jr. ("Judge Coburn") granted in part and denied in part the defendants' motion to dismiss the Securities Action. Specifically, Judge Coburn found:

> However, Plaintiffs' Amended Complaint includes allegations, supported by numerous CWs, that Defendants were aware of the serious operational shortcomings that plagued Krispy Kreme's manufacturing and logistics network at the start of the McDonald's partnership.
>
> …
>
> Interpreted in the light most favorable to Plaintiffs, these facts suggest that Defendants were aware of, or at least recklessly disregarded, information about Krispy Kreme's operational deficiencies, the vast capital expenditures required to execute the McDonald's partnership, and the success (or lack thereof) of the rollout by February 2025. Thus, Plaintiffs met their burden by pleading a strong inference of scienter.

18. On September 16, 2026, Plaintiff's counsel wrote to Mr. Adams as follows:

> Now that the allegations in the securities class action have passed the heightened pleading standards of the Private Securities Litigation Reform Act and pled an

> indicia of securities fraud against Krispy Kreme and its officers, none of the concerns outlined in the Deferral provide a reasonable basis to continue the indefinite deferral of the Board's obligations under Delaware law. Ultimately, the Shareholder believes the time is ripe for the Board to initiate an investigation into the allegations detailed in the Shareholder's April 22, 2026 litigation demand.
>
> To that end, the Shareholder formally requests: (1) the Board amend its position and immediately begin an investigation; and (2) provide Shareholder with copies of the executed tolling agreements referenced in the Deferral.

19. The correspondence also asked for copies of tolling agreements with the Individual Defendants which had allegedly already been executed. A true and correct copy of Plaintiff's counsel's September 16, 2026 correspondence is attached hereto as Exhibit C.

20. It has now been six weeks since the September 16, 2026 letter and there has been no response. It is clear that the Board has no intention of fulfilling their responsibilities under Delaware law and investigating the clearly meritorious allegations detailed in the Demand. The Demand has therefore been improperly constructively refused and this shareholder derivative action should be allowed to proceed.

## JURISDICTION AND VENUE

21. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

22. This Court has jurisdiction over each Defendant because they reside in this district or have sufficient minimum contacts with this district to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has

personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state, has consented to service in this state and its principal place of business is within this district.

23. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains offices in this district, a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to the Company occurred in this district, and Individual Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

## PARTIES

24. Plaintiff is a current shareholder of Krispy Kreme and has continuously held Krispy Kreme common stock since December 2021. Plaintiff is a citizen of Washington.

25. Nominal Defendant Krispy Kreme is incorporated under the laws of Delaware and its principal executive offices are located in Charlotte, North Carolina. Krispy Kreme's common stock trades on the Nasdaq exchange under the symbol "DNUT."

26. Defendant Joshua Charlesworth ("Charlesworth") has served as Krispy Kreme's CEO and as a member of the Board since January 2024. Defendant Charlesworth previously served as Krispy Kreme's Chief Operating Officer and CFO before the start of the Relevant Period. Defendant Charlesworth received $3,693,795 in total compensation from Krispy Kreme in fiscal year 2025, and $2,510,455 in total compensation in fiscal year 2024. Upon information and belief Defendant Charlesworth is a citizen of North Carolina.

27. Defendant Jeremiah Ashukian ("Ashukian") served as Krispy Kreme's CFO from January 2023 until July 11, 2025. Defendant Ashukian received $1,125,089 in total compensation

from Krispy Kreme in fiscal year 2025, and $1,777,486 in total compensation in fiscal year 2024. Upon information and belief Defendant Ashukian is a citizen of North Carolina.

28. Defendant Marissa Andrada ("Andrada") served as a member of the Board from February 2022 until June 10, 2026. During the Relevant Period, defendant Andrada served as Chair of the Remuneration and Nomination Committee (the "Compensation and Governance Committee"). Defendant Andrada received $208,079 in total compensation from Krispy Kreme in fiscal year 2025, and $170,013 in total compensation in fiscal year 2024. Upon information and belief Defendant Andrada is a citizen of Tennessee.

29. Defendant David Bell ("Bell") served as a member of the Company's Board from September 2016 until June 2025. Defendant Bell received $30,000 in total compensation from Krispy Kreme in fiscal year 2025, and $160,013 in total compensation in fiscal year 2024. Upon information and belief Defendant Bell is a citizen of California.

30. Defendant Patricia Capel ("Capel") has served as a member of the Board since June 2024 and as Chair of the Board since 2025. Defendant Capel received $363,231 in total compensation from Krispy Kreme in fiscal year 2025, and $30,000 in total compensation in fiscal year 2024. Upon information and belief Defendant Capel is a citizen of Florida.

31. Defendant David Deno ("Deno") has served as a member of the Board since September 2016 and serves as Chair of the Audit & Finance Committee (the "Audit Committee"). Defendant Deno received $213,271 in total compensation from Krispy Kreme in fiscal year 2025, and $175,013 in total compensation in fiscal year 2024. Upon information and belief Defendant Deno is a citizen of Florida.

32. Defendant Olivier Goudet ("Goudet") served as a member of the Board from September 2016 until June 2025 and as Chair of the Board from May 2017 until his departure from

the Board at Krispy Kreme's 2025 annual meeting. Defendant Goudet received $100,000 in total compensation from Krispy Kreme in fiscal year 2025, and $455,010 in total compensation in fiscal year 2024. Upon information and belief Defendant Goudet is a citizen of New York.

33. Defendant Paul S. Michaels ("Michaels") served as a member of the Board from May 2017 until June 2025. During the Relevant Period, defendant Michaels served as a member of the Audit Committee and the Compensation and Governance Committee. Defendant Michaels received $40,000 in total compensation from Krispy Kreme in fiscal year 2025, and $190,013 in total compensation in fiscal year 2024. Upon information and belief Defendant Michaels is a citizen of New Jersey.

34. Defendant Gerhard Pleuhs ("Pleuhs") served as a member of the Board from June 2022 until June 10, 2026. Defendant Pleuhs served as a member of the Audit Committee and the Compensation and Governance Committee during the Relevant Period. Defendant Pleuhs received $222,887 in total compensation from Krispy Kreme in fiscal year 2025, and $170,013 in total compensation in fiscal year 2024. Upon information and belief Defendant Pleuhs is a citizen of New Jersey.

35. Defendant Debbie Roberts ("Roberts") served as a member of the Board from April 2021 until June 2025. Defendant Roberts received $30,000 in total compensation from Krispy Kreme in fiscal year 2025, and $160,013 in total compensation in fiscal year 2024. Upon information and belief Defendant Roberts is a citizen of Illinois.

36. Defendant Philip Telfer ("Telfer") served as a member of the Board from September 2022 until June 2025. During the Relevant Period, defendant Telfer served as a member of the Audit Committee. Defendant Telfer received $32,500 in total compensation from

Krispy Kreme in fiscal year 2025, and $165,013 in total compensation in fiscal year 2024. Upon information and belief Defendant Telfer is a citizen of Australia.

37. Defendant Michelle Weese ("Weese") served as a member of the Board from December 2020 until June 2025. Defendant Weese received $30,000 in total compensation from Krispy Kreme in fiscal year 2025, and $160,013 in total compensation in fiscal year 2024. Upon information and belief Defendant Weese is a citizen of New Jersey.

38. Collectively, Defendants Charlesworth, Ashukian, Andrada, Bell, Capel, Deno, Goudet, Michaels, Pleuhs, Roberts, Telfer, and Weese are collectively referred to herein as the "Individual Defendants."

39. The Individual Defendants and Nominal Defendant are together referenced herein as "Defendants."

## INDIVIDUAL DEFENDANTS' DUTIES

40. By reason of their positions as officers, directors, and/or fiduciaries of Krispy Kreme, and because of their ability to control the business and corporate affairs of the Company, Individual Defendants owed Krispy Kreme and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.

41. Further, Individual Defendants were and are required to act in furtherance of the best interests of Krispy Kreme and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest and benefit. Each director and officer of the Company owes to Krispy Kreme and its shareholders the fiduciary duty to exercise good faith and due diligence in the administration of the Company's affairs, and in the use and preservation of its property and assets, as well as the highest obligation of fair dealing.

42. Because of their positions of control and authority as directors and/or officers of Krispy Kreme, having knowledge of material non-public information regarding the Company, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties the Individual Defendants were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public; and

c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

### *A. Background*

43. According to its public filings, Krispy Kreme is a doughnut brand that originally became a public company in 2000, but was taken private by JAB Holdings in 2016. JAB Holdings re-listed Krispy Kreme on public markets again in 2021.

44. Following its 2021 initial public offering ("IPO"), Krispy Kreme struggled with losses and a heavy debt load. The Company reassured investors that "far and away" the biggest reason people did not buy their donuts was simply "lack of access." In the past, Krispy Kreme had focused more on its "Hot Light Theater Shops" – retail locations featuring an on-site donut production line visible to customers, where customers could watch fresh donuts get made and which also served as local production facilities for the distribution of donuts to other points of access in the Company's network. In an effort to address the capital-intensive nature of this business model, Krispy Kreme adopted a "hub and spoke" approach in 2016.

45. Under this model, Krispy Kreme began using a combination of Hot Light Theater Shops and "Doughnut Factories" (production facilities that are not accessible to customers) as "hubs" for donut production, and distributing donuts from these hubs to various "spokes," including the Company's own "Fresh Shops" (Krispy Kreme retail locations that do not include production facilities) and various "Delivered Fresh Daily" locations, referred to as "DFD Doors," such as grocery stores, convenience stores, and fast food restaurants. After going public, Krispy Kreme grew the DFD component of its business, reaching 6,000 U.S. customer points of access and 12,000 global customer points of access by 2023.

### B. The Individual Defendants Announce Partnership with McDonald's

46. In further support of its DFD efforts, Krispy Kreme announced that it would be testing the use of McDonald's restaurants as customer points of access in October 2022. Although Krispy Kreme maintained at this time that its business with McDonald's was merely a test to determine the Company's ability to scale its business model, the Individual Defendants were clear in presentations to investors that an expanded partnership with McDonald's would create financial opportunity for the Company.

47. Less than five months later, on February 27, 2023, the companies announced that the test program would grow to 160 McDonald's locations around the Louisville-Lexington, Kentucky area. According to the press release announcing the expansion, the "expanded test" aimed to evaluate the "operational impact" of delivering fresh doughnuts on "a larger scale" and to "explore customer demand" for Krispy Kreme doughnuts at McDonald's locations.

48. The Company noted that the this test-run was successful and conducted another roll-out of doughnuts in McDonald's locations beginning November 12, 2022. The Company expanded its test run to cover 160 restaurants across Louisville and Lexington. McDonald's stated in their announcement of the second roll-out that Krispy Kreme doughnuts would have ". . . nationwide availability at participating restaurants by the end of 2026."

49. As the Individual Defendants made clear in investor presentations, the ability to have "More Points of Access," which was exactly what McDonald's provided, would lead to "Higher Sales per Hub," which, in turn, meant "Higher EBITDA Margin." Thus, the "unique unlock" of the expanded test was ensuring that the DFD system worked seamlessly to bring fresh doughnuts across all customers on the route—including McDonald's—which the Individual Defendants assured "it does."

**C. The Individual Defendants Tout the McDonald's Venture**

50. Given the importance of a potential nationwide deal with McDonald's, the Individual Defendants repeatedly assured investors that they were closely monitoring the expanded McDonald's test for both operational performance and customer demand. Relatedly, the Individual Defendants represented that the McDonald's rollout would only proceed if the Company was able to handle the logistics profitably, and that they had carefully analyzed the costs and logistics necessitated by such a major deal. For example, during a Morgan Stanley Global

Consumer & Retail Conference held on December 5, 2023, Charlesworth emphasized that Krispy Kreme had conducted "a lot of detailed work" on the potential McDonald's expansion and concluded that the associated expenses would remain modest. In fact, Charlesworth stated that the Company could service "just under half" of McDonald's locations—approximately 6,000 new doors—using its "existing capacity" and requiring little more than "just [] trucks and drivers."

51. On March 26, 2024, when Krispy Kreme filed a joint press release with McDonald's announcing the expansion of the companies' partnership on Form 8-K with the SEC. The press release noted that the expansion came after "a successful test at 160 McDonald's restaurants in Lexington and Louisville, Kentucky areas where consumer excitement and demand exceeded expectations" and made the following representations:

> The Golden Arches and Krispy Kreme, one of the most beloved sweet treat brands in the world, are teaming up for a national expansion. Fans will begin spotting Krispy Kreme doughnuts in their local McDonald's restaurants later this year as part of a phased market rollout across the country. Nationwide availability at participating restaurants is expected by the end of 2026. Three of Krispy Kreme's most popular doughnuts will be delivered fresh to McDonald's restaurants every day.

52. The press release continued, "Krispy Kreme has been scaling its supply chain, building a support team, adding technology and new equipment, and enhancing field training to support its Delivered Fresh Daily expansion, which includes this phased rollout." Defendant Charlesworth was quoted in the press release as stating:

> Significantly, by making Kreme Krispy accessible to fans nationwide through this partnership, we expect to more than double our points of access by the end of 2026. The partnership accelerates the development of our existing Delivered Fresh Daily channel, creating operating leverage through distribution density and production utilization[.]

53. Krispy Kreme reported its results for the first quarter of fiscal year 2024 in a press release filed on Form 8-K with the SEC on May 9, 2024. Defendant Charlesworth was quoted as

stating that Krispy Kreme would "support much of th[e] nationwide rollout" of the Krispy Kreme partnership "using existing capacity, while adding distribution with other major customers as we grow." In an investor presentation filed with the first quarter results, the Company told investors that it expected Krispy Kreme donuts to be "delivered fresh daily" at over "12,000 restaurants [] by end of 2026" and claimed the partnership was "accelerating profitable U.S. expansion[.]"

54. The Individual Defendants caused the Company to host an earnings call to discuss its first quarter results the same day. Defendant Charlesworth again asserted that "[m]uch of the national rollout" could be accomplished "using existing capacity."

55. In response to an analysts question about whether the Company "fully committed to going to [] 12,000 [McDonald's locations] through 2026," Charlesworth said, "the partnership is going really great so far after what was obviously a great Kentucky test and very thorough test that demonstrated that consumer demand outstripped both [McDonald's] and our expectations." In response to a follow-up question about what the Kentucky test showed as far as how the McDonald's partnership "expands [Krispy Kreme's] overall doughnut market[,]" Charlesworth said the Company had "obviously" had "a prolonged period of time with the Kentucky test to see the impact of that incrementality" and assured investors that Krispy Kreme had "done the analysis and the numbers that are in the incrementality that [the Company] shared today [were] based off a very thoughtful analysis."

56. Also on May 9, 2024, Charlesworth participated in an interview on a Yahoo! Finance news program, where he was asked "what exactly happened during that 160 store test" in Kentucky that gave him "the confidence that [he] could expand this nationally[.]" Again, Charlesworth asserted that the Kentucky test had shown "the incrementality of [McDonald's] business [] for Krispy Kreme overall" and given the Company "a lot of confidence for a national

rollout [with] McDonald's[.]" He said that "consumer demand exceeded [the Company's] expectations" and that both "the consumer reaction" and "the partnership with the McDonald's team" had "work[ed] really well."

57. Krispy Kreme reported its financial results for the second quarter of fiscal year 2024 on August 8, 2024. In a press release filed on Form 8-K with the SEC, defendant Charlesworth claimed the Company's "profitable nationwide expansion [was] accelerating," including "the nationwide rollout to McDonald's, starting this fall in the Midwest with Chicago." That same day, the Company published an investor presentation highlighting how the McDonald's partnership was "accelerating profitable U.S. expansion[.]"

58. A slide from the investor presentation projected that in 2024, over 1,000 McDonald's restaurants would be "serving fresh doughnuts[,]" with an additional 5,000 in 2025 and 6,000 in 2026, resulting in over 12,000 McDonald's restaurants "serving fresh doughnuts[.]"

59. During an analyst and investor call on August 8, 2024, to discuss the Company's second quarter 2024 earnings, Charlesworth continued to downplay the costs of expanding the McDonald's partnership. He reiterated the claim that "[i]n the early months, nearly all of the expansion is serviced by existing production hubs" and said "the overall message" was that "the expansion of delivered fresh daily in the U.S. is leveraging an underutilized system, [and] the additional densification of all that distribution means you get flow through to the bottom line[.]"

60. An analyst asked defendant Charlesworth on the August 8, 2024 call whether Krispy Kreme was "still on track" with the McDonald's rollout, saying "I think the idea had been to kind of increase ratably the number of stores over time. Does that still sound like the right kind of rollout plan?" Charlesworth responded:

> Yes, the McDonald's partnership is going very well in general. And the rollout is on track… We have a dedicated cross-functional team there to make sure the

> facilities and our people are ready. In fact, we're also making improvements to the production lines and even doing our best to improve productivity and up our game as we go. We're very focused on delivering a really high quality service to the McDonald's restaurants so that people get awesome fresh donuts every day at the same quality level they're expecting Krispy Kreme and other channels.

61. Defendants Charlesworth and Ashukian participated in the Piper Sandler Growth Frontiers Conference on September 10, 2024, at which they were asked about how Krispy Kreme planned to expand its hub-and-spoke model in the U.S. to accommodate the expansion of the McDonald's partnership. Defendant Charlesworth again emphasized the Company's ability to handle "the first 6,000 with just our existing production facilities, a lot of them former franchisees, a few years old, heavily underutilized." He said Krispy Kreme was "able to leverage that" existing capacity "to service the demand," providing "a very clear path to support [the McDonald's] expansion."

62. With respect to costs, defendant Ashukian claimed at the September 10, 2024 conference that "EBITDA will be the main source of deleverage in the future, especially as we kind of ramp up McDonald's. We typically spend 6% to 7%, 7% to 8% on CapEx, so we're not ramping up CapEx over the next couple years to fund some of the expansion in the US."

63. The SEC sent a letter to defendant Ashukian on September 30, 2024, informing him that its Division of Corporation Finance, Office of Trade & Services had reviewed Krispy Kreme's SEC filings, including the Company's Form 10-Q for the second quarter of 2024, and requested that Ashukian "disclose the material terms of your Business Relationship Agreement with McDonald's[,]" including Krispy Kreme's "rights and obligations under the agreement, the estimated capital expenditure necessary to meet such obligations, the duration of the agreement, and the terms of cancellation." The letter "remind[ed] [Ashukian] that the [C]ompany and its management are responsible for the accuracy and adequacy of their disclosures[.]"

64. On October 10, 2024, defendant Ashukian filed a public letter responding to the SEC in which he repeated Defendants' previous claim that the Company was "not subject to capital expenditure commitments or obligations specific to the relationship with McDonald's." Ashukian stated that Krispy Kreme "plan[ned] to support much of this expansion using existing capacity[.]" The Company did "not expect a significant increase in capital expenditures as a percentage of revenue in 2024[,]" and while he did expect "U.S. capital expenditures as a percentage of revenue to increase in fiscal 2025 and 2026 associated with acceleration of the overall U.S. business expansion, these capital expenditures support the overall DFD and retail channels and are not directly attributable to, or required by, this agreement."

65. Krispy Kreme released its earnings results for the third quarter of 2024 on November 7, 2024, issuing a press release in which defendant Charlesworth lauded "[t]he successful start of our nationwide U.S. rollout at McDonald's which began in Chicago in October and continues next week across Ohio and Indiana." Similarly, an investor presentation issued the same day proclaimed a "successful start to nationwide McDonald's rollout" thanks to "strong operational execution" and "positive consumer response[.]" Charlesworth would go on to tell analysts in an earnings call the same day:

> Well, McDonald's customers, they're clearly excited to see our fresh doughnuts on the menu . . . So what we're seeing so far is a really good response in line with our original assumptions. We're seeing incrementality in Chicago, no obvious impact on our existing doughnut shops there and plenty of positive feedback from the McDonald's teams. And regarding the reception of the brand in Chicago, I think that the strong support McDonald's is putting behind this is no doubt part of that. And indeed, you heard us reference earlier today, the confidence that we have from the success is having us sort of accelerate to service more restaurants as fast as we can, all align with our strategy of becoming bigger and better. So we're really pleased with the start, both from a consumer response point of view and the reception we've got from the McDonald's team about our service and quality doughnuts.

***

> I think the learnings are that it's working as we expected. I think that clearly, the McDonald's team have been making preparations since the Kentucky pilot through to the Chicago launch, which really set it apart. . . . And our teams are doing a great job and making sure that they get at the right time, the right quantities and adapting to feedback as it comes. I think probably the biggest challenge has probably been more on the delivery side, making sure that we know all the best routes to all these locations. Imagine more than 400 McDonald's added in a day for us. There's bound to be small operational adjustments needed. But I think the team have really taken that to heart and taken all learning they can and applying it to the pending rollouts. I mean with more than 1,000 going over the next couple of weeks, obviously, this now takes us to another level, and we need to scale and hence, our commitment to get it right. There's a few start-up costs. There's a few extra people making sure that we deliver right first time. But the team will settle into it and certainly been impressed with the partnership from the restaurant operators at McDonald's.

66. On November 8, 2024, Krispy Kreme filed its quarterly report for the third quarter of 2024 on Form 10-Q with the SEC. The quarterly report again claimed that Krispy Kreme's capital expenditures associated with the expansion of the McDonald's partnership "support the overall DFD and retail channels and are not directly attributable to, or required by, the agreement with McDonald's[.]"

**D. The Truth is Revealed**

67. On February 25, 2025, just three months after praising the "success" of the rollout, the truth about the Company's partnership with McDonald's began to emerge. On that date, Krispy Kreme announced poor fourth quarter 2024 results and issued full-year 2025 guidance that fell far short of expectations. Specifically, for fourth quarter 2024, the Company reported net revenue of $404 million—missing analysts' $415 million estimate—and $45.9 million in adjusted EBITDA, far below analysts' consensus of $58.7 million. In addition, while analysts had been projecting 2025 revenues between $1.76 billion and $1.94 billion, Krispy Kreme now forecasted just $1.55 billion to $1.65 billion—a reduction of approximately 12% to 15%. Further, while adjusted EBITDA estimates had been $235 million to $259 million, Krispy Kreme's guidance was only $180 million to $200 million, a 15% to 31% shortfall amid increased costs. Projected earnings per

share fared even worse, as the Company now expected $0.04 to $0.08 in EPS—72% to 86% below analysts estimates.

68. Significantly, during the earnings call held the same day, Ashukian acknowledged that the Company had in fact experienced issues with the McDonald's expansion. Specifically, the Individual Defendants acknowledged that Krispy Kreme had "seen consumer softness" specifically in McDonald's where "demand has dipped actually a little lower than we expected." Moreover, the Company also expected "margin compression" due to the need to make "long-term business investments" to fund the national rollout. Thus, contrary to the Individual Defendants' prior statements that the Company would be able to leverage existing capacity with limited investment, the "start-up costs from [the] US expansion" were now higher than the Company had previously let on. Moreover, despite previously claiming that Krispy Kreme could rely on its "existing capacity," with the Company only needing to make modest investments in items like "trucks and drivers," the Company would now engage a third-party company to execute "more than half of our DFD deliveries by year-end," which Charlesworth explained would provide "predictability in costs" and a "more streamlined set of operations."

69. In response to the news, Krispy Kreme stock decreased 35% over the following two days from a close of $9.13 on February 24, 2025 to just $5.97 on February 26, 2025.

70. Despite these issues, the Individual Defendants assured investors that the lower demand at McDonald's locations was simply due to a lack of marketing and consumer "awareness" that the doughnuts were available in the McDonald's stores—and not to any infrastructure or logistics deficiencies that plagued the Company's operations. Charlesworth continued to tout he purported success of the McDonald's expansion, boasting that Krispy Kreme was already delivering to 2,500 McDonald's locations and "remain[ed] on track to reach about 6,000

restaurants by year-end." In fact, Charlesworth emphasized that Krispy Kreme "launched daily deliveries to approximately 500 McDonald's restaurants in the Greater New York City area" that very morning, and that Krispy Kreme's service and quality was resonating, as "the feedback from McDonald's is very positive."

71. On February 27, 2025, Krispy Kreme filed its annual report for fiscal year 2024 on Form 10-K with the SEC, signed by defendants Charlesworth, Ashukian, Andrada, Bell, Capel, Deno, Goudet, Pleuhs, Michaels, Roberts, Telfer, and Weese, which substantially repeated the representations about capital expenditures not being directly attributable to the McDonald's partnership.

72. Charlesworth assuaged investors' concerns about increased costs by claiming that Krispy Kreme was finding "more and more ways to leverage our existing capacity," through "increased productivity at our existing hubs" and improving Krispy Kreme's ability "to get the doughnuts out to the points of access better and better." As a result of these purported efficiencies, the Company would not need to invest as much as the McDonald's rollout continued.

73. On May 8, 2025, the full truth emerged. In stark contrast to the Individual Defendants' repeated assurances just two months earlier that the McDonald's rollout remained entirely "on track," the Individual Defendants admitted the Company had effectively abandoned the McDonald's expansion by no later than February 2025. Specifically, after representing to the market on February 25, 2025 that Krispy Kreme had "today" expanded into 2,500 McDonald's locations, the Company now revealed that Krispy Kreme had not added a single new McDonald's location since February 25, 2025, and that the number of its McDonald's locations had actually decreased, as it was servicing only 2,400 McDonald's as of the May 8, 2025 call. Moreover, the Company disclosed that it did "not expect to launch in any additional restaurants in the second

quarter of 2025," and that the McDonald's expansion was ceased precisely because Krispy Kreme had not "achieve[d] a profitable business model" with the McDonald's partnership.

74. Furthermore, contrary to the Individual Defendants prior statements that there were no "unexpected" costs in connection with the rollout, and that Krispy Kreme had only seen a "[p]ositive consumer response," Charlesworth now admitted that for the Company "[t]o deliver sustainable, profitable growth," Krispy Kreme needed to both "increase sales by stimulating higher demand and cutting costs by simplifying operations." Charlesworth further added how the Company needed to "improve sales, simplify operations" with McDonald's.

75. Moreover, while the Individual Defendants had previously touted the Company's "strong operational execution" and that it was delivering "always so fresh" doughnuts every day at the "right time [and] right quantities," the Individual Defendants now revealed that the Company's infrastructure was so poor that Krispy Kreme would completely remove itself from the distribution process and "fully outsource U.S. logistics" by mid-2026 for all customers. In addition, Charlesworth acknowledged that the Company needed to overhaul baking operations to be as "simplified and streamlined as they can be." Similarly, given the Company's poor operational performance, Charlesworth revealed that Krispy Kreme implemented a "new technology" to "better assess performance and make data-driven decisions to improve quality, service and efficiency."

76. As a result of these severe problems with the McDonald's partnership, Krispy Kreme issued disastrous financial results, reporting just $15.9 million of adjusted EBITDA for its U.S. segment— a 62% decline as compared to the first quarter of 2024—which it primarily blamed on "costs associated with our U.S. nationwide expansion." In addition, the Company pulled its 2025 outlook completely without providing alternative guidance, and in a desperate attempt to

save cash, the Individual Defendants announced that Krispy Kreme would scrap its $0.35 quarterly dividend that the Company had been consistently paying since 2021.

77. The market reacted sharply to this news. After closing at $4.33 per share on May 7, 2025, Krispy Kreme's shares plunged 37% over the following two days to close at just $2.73 per share on May 9, 2025.

78. On June 24, 2025, the Individual Defendants announced that the McDonald's partnership was terminated entirely, specifically because of the enormous costs and lack of demand for the rollout. In announcing the termination, Charlesworth acknowledged that the "efforts to bring our costs in line with unit demand were unsuccessful, making the partnership unsustainable" for Krispy Kreme.

79. On June 27, 2025, both Ashukian, the Company's CFO, as well as David Skena, Krispy Kreme's Chief Growth Officer stepped down from their roles.

80. On July 4, 2025, a *The Wall Street Journal* published an article titled "Why Krispy Kreme and McDonald's Broke Up." Therein, *The Wall Street Journal* found that Krispy Kreme's logistical failures and inconsistent product quality were the major factors in the collapse of the McDonald's partnership. The investigation found that the Krispy Kreme "supply was uneven" as McDonald's "franchisees said deliveries were irregular, with a day sometimes passing between each one." These problems stemmed from the fact that the Company was unable to handle the logistics required from the partnership, as "Krispy Kreme stores were overwhelmed by the volume of pastries they needed to make and pack for McDonald's." Compounding the problem, quality was "inconsistent," with doughnuts arriving with "scant sprinkles, smeared with cream or cold." *The Wall Street Journal* also obtained an internal McDonald's memo circulated to franchisees,

noting that during the partnership, McDonald's had "sought improvements across [Krispy Kreme's] invoicing, operations, and distribution approach" before terminating the partnership.

81. On August 7, 2025 the Individual Defendants revealed that the McDonald's termination was a trigger for a massive goodwill impairment charge of $356 million. Critically, more than $270 million of this charge was tied to Krispy Kreme's U.S. segment, which lost over 40% of its goodwill value due in part to the McDonald's venture.

### G. The Securities Action

82. As described above, the allegations detailed herein precipitated the initiation of the Securities Action in the U.S. District Court for the Western District of North Carolina, in which various claims under the federal securities laws, including claims for fraud, have been asserted against Krispy Kreme, Charlesworth and Ashukian.

83. On August 26, 2026, Judge Cogburn issued a ruling on the defendants' motion to dismiss, granting it in part and denying it in part. Specifically, Judge Cogburn held that the Plaintiffs had sufficiently pled that the defendants made "actionable misstatements" that "Krispy Kreme would achieve the McDonald's rollout using existing logistical infrastructure and production capacity[,]" that "the McDonald's partnership would not require significant up-front costs and capital expenditures[,]" and that the defendants had improperly "tout[ed] the operational success of the national McDonald's rollout and claim[ed] that the company was still on track to expand to 6,000 McDonald's restaurants by the end of the year."

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

84. Plaintiff brings this action derivatively in the right and for the benefit of Krispy Kreme to redress Individual Defendants' breaches of fiduciary duty and other violations of law.

85. Plaintiff will adequately and fairly represent the interests of Krispy Kreme and its shareholders in enforcing and prosecuting its rights.

86. As a result, Plaintiff served the Demand on April 22, 2026. In accordance with Delaware law, the Demand required the Board to commence an investigation in the allegations detailed above. A true and correct copy of the Demand is attached hereto as Exhibit A.

87. On April 28, 2026, Plaintiff's counsel received correspondence from Krispy Kreme's Chief Legal Officer Atiba Adams who acknowledged the Board's receipt of the Demand and requested proof of Plaintiff's current ownership of Krispy Kreme stock. Plaintiff provided this evidence on May 7, 2026.

88. On July 6, 2026 Mr. Adams again wrote to Plaintiff's counsel, detailing the Board's decision to defer consideration of the Demand (the "Deferral"). In support of that decision, Mr. Adams specifically highlighted the Securities Action, noting that (1) the Demand and the Securities Action shared allegations; (2) that "he pursuit of the claims in the demand may adversely impact the Company's ability to effectively defend that action;" and (3) "…it would be inefficient and costly to pursue the demanded claims at this time and could interfere with the defense of the securities class action." A true and correct copy of the Deferral is attached hereto as Exhibit B.

89. On September 16, 2026, after the defendants failed to dismiss the Securities Action, Plaintiff's counsel wrote to Mr. Adams as follows:

> Now that the allegations in the securities class action have passed the heightened pleading standards of the Private Securities Litigation Reform Act and pled an indicia of securities fraud against Krispy Kreme and its officers, none of the concerns outlined in the Deferral provide a reasonable basis to continue the indefinite deferral of the Board's obligations under Delaware law. Ultimately, the Shareholder believes the time is ripe for the Board to initiate an investigation into the allegations detailed in the Shareholder's April 22, 2026 litigation demand.

> To that end, the Shareholder formally requests: (1) the Board amend its position and immediately begin an investigation; and (2) provide Shareholder with copies of the executed tolling agreements referenced in the Deferral.

90. A true and correct copy of Plaintiff's counsel's September 16, 2026 correspondence is attached hereto as Exhibit C.

91. It has now been six weeks since the September 16, 2026 letter and there has been no response. It is clear that the Board has no intention of fulfilling their responsibilities under Delaware law and investigating the clearly meritorious allegations detailed in the Demand. The Demand has therefore been improperly constructively refused and this shareholder derivative action should be allowed to proceed.

**COUNT I**

**Against Individual Defendants for Breach of Fiduciary Duties**

92. Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

93. Also as alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company maintained adequate internal controls regarding financial disclosures, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

94. In breach of their fiduciary duties owed and owing to Krispy Kreme, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, inter alia: (i) at all relevant times, the national rollout of Krispy Kreme's partnership with McDonald's was not on track, but rather suffered from major operational deficiencies; (ii) the Company was not able to

accommodate the McDonald's partnership rollout primarily "using existing capacity," but rather required massive capital expenditures specifically tied to the McDonald's partnership; (iii) the McDonald's partnership was not a successful, profitable venture, but rather was plagued with quality control issues and unsustainably low demand from the start; and (iv) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

95. The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls in breach of their fiduciary duties. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard to the truth in that they failed to ascertain and disclose such facts even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

96. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the

Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

97. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages. Thus, as a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT II**

**Against Individual Defendants for Unjust Enrichment**

98. Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

99. By their wrongful acts and omissions, Individual Defendants were unjustly enriched at the expense of and to the detriment of Krispy Kreme.

100. Plaintiff, as a shareholder and representative of Krispy Kreme, seeks restitution from Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Individual Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

101. WHEREFORE, Plaintiff demands judgment as follows:

a. Declaring that Plaintiff may maintain this derivative action on behalf of Krispy Kreme and that Plaintiff is a proper and adequate representative of the Company;

b. Against Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Individual Defendants' breaches of fiduciary duties;

c. Directing Krispy Kreme to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable law and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

d. Awarding to Krispy Kreme restitution from Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Individual Defendants;

e. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

f. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

102. Plaintiff demands a trial by jury.

Dated: November 3, 2026

Respectfully submitted,

**ROSENWOOD, ROSE & LITWAK, PLLC**

*s/ Erik M. Rosenwood*

Erik M. Rosenwood (NC Bar No. 28049)
1712 Euclid Avenue
Charlotte, NC 28203
Telephone: (704) 293-0847
erik@rosenwoodrose.com

**THE WEISER LAW FIRM, P.C.**
JAMES M. FICARO
jficaro@weiserlawfirm.com
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Telephone: (610) 225-2677

**KRISPY KREME, INC. VERIFICATION**

I, Mark Chase, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint, and that I have authorized the filing of the Verified Shareholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 11/02/2026

Mark Chase
Mark Chase (Nov 2, 2026 15:26:43 PST)

Mark Chase